Ricky HALL, Appellant,

v.

The STATE of Texas, Appellee.

No. 07–97–0061–CR.

Court of Appeals of Texas,
Amarillo.

May 15, 1998.

Rehearing Overruled June 16, 1998.

Nelson & Hall (Mark C. Hall), Lubbock, for appellant.

Lubbock County District Attorney (William C. Sowder) (Chad Meacham), Lubbock, for appellee.

Before BOYD, C.J., and DODSON and QUINN, JJ.

QUINN, Justice.

Ricky Hall appeals from a judgment convicting him of capital murder. In seven points of error, he contests the legal and factual sufficiency of the evidence, the court's refusal to admit evidence regarding the results of a polygraph taken by a witness, the court's admission of testimony by a blood spatter expert, and the court's failure to submit an instruction further defining an element of the crime of capital murder. We affirm.

### Factual Background

During the late evening hours of May 31, 1996, Robert Lee "R. L." Draper, a physically diminutive man in his 50's, went to the home of Kathy Lewis in Lubbock, Texas. The two met to talk and drink beer. After visiting for a short time, Draper went outside to his car, which was parked in Lewis' driveway, to retrieve more beer. Several minutes passed when Olan Jackson, an individual who was at the Lewis residence, exclaimed that "this man is beating up this old man." The "old man" referred to was Draper. Furthermore, the person doing the beating was appellant, a heavily muscled adult male standing 6'5" to 6'6". Appellant had arrived at the scene on a bicycle purportedly to buy drugs for a woman already present.

Once outside, Lewis observed appellant repeatedly hitting Draper with his fists. Draper was "down" as appellant struck him, and Lewis' attempts to help met with little success. She first called to the injured man several times, but he responded only once. Then, she tried to carry him away, but appellant struck her. This caused Lewis to lose her hold on Draper, who then slid back to the ground. Fearing further attack, Lewis ran

back into her house, locked the doors, and extinguished the lights. Yet, she continued to hear appellant pummeling Draper as appellant yelled "nigger, don't you move ..." and "nigger, didn't I tell you not to move." Appellant was also heard exclaiming "a bitch done already killed my brother." [1]

Eventually, Jackson tried to intervene. He too was struck by appellant. So, he ran away but not before seeing the female companion with appellant also being hit.

Approximately five to fifteen minutes passed before Lewis heard Draper's car leaving. She initially thought that Draper was the one driving away but had seen appellant remove the car keys from Draper's pocket. Nevertheless, no attempt was made to investigate. Rather, Lewis remained barricaded in her house. The evidence did reveal, however, that appellant was the one who drove away in the car, leaving his bike behind. Furthermore, his female companion had left with him. The car was later found abandoned at a local convenience store with portions of its stereo system gone. Its dash and trunk had also been damaged.

Others also witnessed the incident between Draper and appellant. One such person, Michael Clemons, testified to seeing the two "fussing with each other" and hearing "the old man ... talking about somebody's girlfriend or something like that." So too did he hear appellant "saying something about his brother getting killed, and he had to get his respect." Yet, he apparently came upon Draper and appellant early in their discussion for he apparently saw no physical confrontation. Rather, he warned appellant against continuing, and appellant allegedly agreed to stop. At that point, Clemons borrowed appellant's bicycle and left. When he returned, in short order, he saw appellant leaving in Draper's car. But, appellant was not gone for long. He drove back to retrieve cigarettes which he had left on the bike. And as appellant returned to the car, he kicked at something in the vicinity were Draper lay, according to Clemons.

The next morning, Draper was found alive in an alley near the Lewis home. Apparent-

ly, someone dragged him there and rummaged through his pockets. Who did this was unknown, though Jackson later was found wearing the victim's watch.

Draper died several days later. He had been taken to a hospital to receive treatment for the numerous bruises, abrasions, and cuts about his chest and face. Medical personnel operated on him to relieve pressure caused by hemorrhaging within his skull. This cranial hemorrhaging later resulted in his death. Moreover, one expert opined that the hemorrhaging was caused by a blow or blows to the head. Though the injury could have emanated from a fall, a fist, or foot could have also been its source. Similarly, the bruises found on Draper's torso were most likely the result of kicking, said the doctor. Finally, he concluded that the death was homicide.

Appellant was indicted for both murder and capital murder. As to the latter, the State accused him of killing Draper "in the course of committing and attempting to commit the offense of robbery." The cause went to trial whereat appellant was convicted of capital murder but received a life sentence.

### Points of Error One, Two, and Three

In points one through three, appellant attacks the legal and factual sufficiency of the evidence underlying the conviction. He contends that the State failed to present adequate evidence illustrating that he acted with the specific intent to kill and that the killing occurred during the course of committing or attempting to commit robbery. We disagree and overrule the points.

#### a. Standard of Review

■ In determining whether a verdict enjoys the support of legally sufficient evidence, we ask if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *King v. State*, 895 S.W.2d 701, 703 (Tex.Crim.App.1995) (en banc). If

---

**1.** Evidence indicated that appellant's brother had previously been killed by a woman.

the answer is yes, then the evidence underlying the conviction is legally sufficient.

■ However, in assessing the verdict's factual sufficiency, we put aside the requirement that the evidence be viewed through a prism of light favorable to the State. Instead, our task is to peruse the entire record and decide whether the overwhelming weight of the evidence so contradicts the verdict as to make that verdict clearly wrong or unjust. *Clewis v. State,* 922 S.W.2d 126, 129 (Tex. Crim.App.1996) (en banc); *Bruno v. State,* 922 S.W.2d 292, 293 (Tex.App.—Amarillo 1996, no pet.). In defining when the scale so tilts, the *Clewis* court invoked such nebulously descriptive terms as "shocks the conscience" and "clearly demonstrates bias." *Clewis v. State,* 922 S.W.2d at 135.

■ Finally, and regardless of which standard is utilized, it remains axiomatic that we defer to the jury's resolution of factual disputes. That is, the power to reasonably infer facts from the evidence, to resolve credibility issues, and to determine who to believe or disbelieve is not ours but the jury's. *Depauw v. State,* 658 S.W.2d 628, 633–34 (Tex. App.—Amarillo 1983, pet. ref'd).

### b. Application of Standard

#### 1. Intent to Cause Death

■ As to the allegation about intent to kill, we find ample evidence to legally support a finding that appellant acted with the specific intent to kill Draper. That evidence consists of 1) the disparity in size between appellant and Draper, 2) appellant's repeated hitting and kicking of Draper as he sat on the ground in a stupor unable to defend himself, 3) appellant's yelling at Draper during the assault, 4) the great force of the blows as evinced by Lewis' ability to hear them from inside her house, 5) appellant's attack upon those who interceded, 6) the dire nature of Draper's injuries, 7) appellant's callousness towards his victim as evinced by the decision to leave the injured man on the ground and take his car once the beating ended, and 9) appellant's resumption of the attack after coming back to the house to retrieve cigarettes. *See Brown v. State,* 508 S.W.2d 91, 96 (Tex.Crim.App.1974) (holding that the disparity in size between appellant

and the child, appellant's repeated hitting of the child, and appellant's decision to leave the child constituted sufficient evidence to evince an intent to kill). Furthermore, we find that evidence enough to insulate the finding against a claim of factual insufficiency when tested against the record as a whole and outside the prism of light favorable to the verdict.

That the medical expert testified to various possible causes of the resulting head trauma and death does not change our conclusion. This is so because no one presented evidence indicating that Draper fell and struck his head. Nor was evidence presented indicating that anyone other than appellant struck the decedent.

#### 2. Murder While Committing or Attempting Robbery

As to the remaining allegations under these points, appellant posits that the evidence was legally and factually insufficient to establish his intent to rob while committing murder. That is, to have committed capital murder, appellant allegedly had to have killed Draper during the course of a robbery. But, the evidence simply illustrated that the robbery was an "afterthought," says appellant.

■ We agree that capital murder (as charged here) requires proof of among other things that appellant 1) killed the decedent and 2) intended to obtain or maintain control of the decedent's property prior to or during the killing. *Zimmerman v. State,* 860 S.W.2d 89, 93 (Tex.Crim.App.) (en banc), *vacated on other grounds,* 510 U.S. 938, 114 S.Ct. 374, 126 L.Ed.2d 324 (1993); *see Moody v. State,* 827 S.W.2d 875, 892 (Tex.Crim.App.) (en banc), *cert. denied,* 506 U.S. 1015, 113 S.Ct. 640, 121 L.Ed.2d 571 (1992) (stating that the State must prove a nexus between the murder and theft, that is, that the murder occurred in order to facilitate the taking of property). Indeed, the point at which the accused developed the requisite intent to rob is critical for it must show that he intended to take the victim's property " 'before, or as, he murdered....' " *Nelson v. State,* 848 S.W.2d 126, 131 (Tex.Crim.App.1992) (en banc), *cert. denied,* 510 U.S. 830, 114 S.Ct.

100, 126 L.Ed.2d 66 (1993) (quoting *White v. State*, 779 S.W.2d 809 (Tex.Crim.App.1989) (en banc), *cert. denied*, 495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990)).

▮ Proof that the taking was an afterthought fails to satisfy this criteria. *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex.Crim.App.1995) (en banc); *Moody v. State*, 827 S.W.2d at 892. Yet, in determining what appellant's intent was at the time, one must not forget that a fact finder is free to look to the conduct of the accused and make reasonable inferences therefrom. *Robertson v. State*, 871 S.W.2d 701, 705 (Tex.Crim.App.1993), *cert. denied*, 513 U.S. 853, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994). And, given his conduct, we hold that a jury could have lawfully concluded appellant committed capital murder.

Again, appellant arrived at Lewis' house on a bicycle to buy drugs. There he met a female companion. Soon, Draper and appellant were engaged in discussion about the woman and appellant's need for respect. At that point, appellant allowed Clemons to leave with appellant's means of transportation, *i.e.*, his bicycle. Then, the discussion turned into a physical attack. Either during or immediately after the initial attack, appellant reached into his victim's pocket, removed his car keys, collected his female companion, entered Draper's car, and drove off. Again, the means of transportation by which he had arrived was no longer available to court his woman around in or to perfect his departure. These circumstances differ little from those in *Huffman v. State*, 746 S.W.2d 212 (Tex.Crim.App.1988) (en banc) and *McGee v. State*, 774 S.W.2d 229 (Tex.Crim.App.1989) (en banc) wherein the court held the evidence sufficient to support conviction for capital murder.

In *Huffman*, the victim died as a result of a brutal beating. Investigation revealed that various of her possessions, including a car, were missing. Eventually, Huffman was found with them. After looking at this evidence in the light most favorable to the verdict and disregarding contrary evidence, the court held it legally sufficient to support

the inference that Huffman intentionally murdered his victim during the course of or while attempting to commit robbery. *Huffman v. State*, 746 S.W.2d at 217. Similarly, in *McGee*, McGee was found in possession of the decedent's car and cash. Though there was no evidence indicating that the appellant demanded money or property from the decedent before attacking him, that was "not the talisman of an intent to steal," according to the court. *McGee v. State*, 774 S.W.2d at 234. This was so because the requisite intent could be garnered from McGee's actions. *Id.* And, those actions consisted of a prior request upon some third party for money to buy Skoal, an attack upon the decedent, the discovery of appellant leaving the decedent's premises, and the discovery of the appellant with the decedent's property.

Admittedly, the Court of Criminal Appeals revisited *Huffman* and *McGee* in *Nelson v. State*. But, it did not overrule either. Rather, it first acknowledged its previous statements (made in both opinions) that "evidence will be sufficient if the State proves that a **robbery** of the victim occurred immediately after the murder of the victim." *Nelson v. State*, 848 S.W.2d at 131 (emphasis in original). Then, it justified the holdings by stating that in focusing upon the facts that they did, both opinions implicitly recognized that proof of intent to take the property before or as the murder occurred was a prerequisite to conviction. *Id.* at 131–32. From this, we gather at least two things. First, *Huffman* and *McGee* remain authoritative. Second, proof of murder coupled with evidence of a *contemporaneous* theft from the victim is enough to enable a jury to rationally conclude, beyond reasonable doubt, that the murder occurred during the course of a robbery and that the accused had the intent to rob at the time of the murder.[2] *See Schexnider v. State*, 943 S.W.2d 194, 198–99 (Tex. App.—Beaumont 1997, no pet.) (stating that to constitute capital murder, the robbery may occur before, during or "in the immediate flight after" the murder). So, since we have evidence of murder coupled with a contemporaneous robbery at bar, we have legal-

---

2. While we may not agree with the logic of the Texas Court of Criminal Appeals, we do not have

the authority to ignore *Huffman, McGee,* or *Nelson.*

ly sufficient evidence supporting conviction under *Huffman, McGee,* and *Nelson.*

As to the matter of factual sufficiency, appellant again questions the quantum of evidence illustrating that he developed the requisite intent to rob during the murder. We candidly admit that the evidence of when appellant garnered the requisite intent is far from clear. The encounter could have been nothing other than a brutal attack followed by theft once the attack was over, as argued by appellant.[3] Or, it could have been a brutal attack in order to obtain Draper's car. After all, appellant had loaned to others his own means of transportation, so he might have needed a vehicle to effectuate an evening of drugs and adventure with his companion, or his escape. Which interpretation of the facts to adopt was left to the fact finder. And, because we are not part of that body, we cannot usurp its right to divine the proper interpretation. We can only hold that given the entire record and considering the contradictory evidence, the interpretation reached was not clearly erroneous or unjust.

### Points of Error Four and Five

■ In his fourth and fifth points, appellant decries the court's decision to exclude the results of a polygraph examination which a witness had taken. This constituted error because 1) the court was obligated to first determine if it was admissible scientific evidence as per *Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App.1992) (en banc), 2) the purported evidence was admissible to impeach the witness, 3) the purported evidence was crucial to appellant's defense, and 4) the decision denied appellant effective assistance of counsel, his right to cross-examine a witness, and due process. We overrule the points.

As stated years ago by the Texas Court of Criminal Appeals, "[i]t has long been the rule in this State that the results of a polygraph test are inadmissible *for all purposes.*" *Nethery v. State,* 692 S.W.2d 686, 700 (Tex. Crim.App.1985) (en banc), *cert. denied,* 474

U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986) (emphasis in original). Since then, the rule has been reconfirmed by the same court. *See, e.g., Tennard v. State,* 802 S.W.2d 678, 683 (Tex.Crim.App.1990) (en banc), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991). Given this absolute declaration by the highest criminal court in this state and our obligation to follow it, we have no choice but to hold that the trial court did not err in excluding evidence about the polygraph test and its results. Whether to modify the dictate in the face of *Kelly* and scientific advancement lies with the Court of Criminal Appeals.

### Point of Error Six

■ In his sixth point of error, appellant attacks the admission of expert testimony regarding blood spatter. Allegedly, the court erred in admitting the testimony because 1) it was not shown to be reliable under *Kelly v. State,* 2) it was unacceptable expert testimony under Rules of Evidence 702 and 705, 3) the alleged expert was not qualified as an expert, 4) the testimony was so speculative as to be unreliable, and 5) the testimony was not helpful to the jury. Assuming *arguendo* that the evidence was inadmissible, we nevertheless overrule the point for the error was harmless.

■ With the adoption of the new rules of appellate procedure, harm now is measured by whether the purported error affects the substantial rights of the complainant. TEX.R.APP. P. 44.2(b). That is, non-constitutional error that "does not affect substantial rights must be disregarded." *Id.* Though the directive is new to the state judiciary, it is not in the federal realm. For some time, courts there have been directed to also ignore like error. 28 U.S.C.S. § 2111 (Law.Co-op.1992); FED.R.CRIM.P. 52(a). Furthermore, in determining when error is harmless those same courts assess whether the judgment was "substantially swayed by

---

**3.** As indicated by appellant, an officer investigating the crime did opine that the robbery or theft was an afterthought. Yet, this very officer also testified that he presented the case to the local district attorney as a capital murder. The latter circumstance indicates that despite his former comment, he nonetheless thought appellant had the requisite intent to rob as the murder occurred. As the finder of fact, it was up to the jury to weigh the credibility of the witness and resolve any conflicts in his testimony. We may not second guess its resolution of that conflict.

the error" after "pondering all that happened without stripping the erroneous action from the whole." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). In other words, if the court is sure, after viewing the entire record, that the error did not influence the jury or had a very slight effect on its verdict, then no substantial right was affected. *United States v. Rodriguez,* 43 F.3d 117, 123 (5th Cir.), *cert. denied,* 115 S.Ct. 2260 (1995). We adopt the federal interpretation of the "affect on substantial rights" test and conclude that no substantial right of appellant was affected.

Here, the testimony of the expert tended to illustrate the position of Draper as he was being attacked, the force of the blows inflicted upon him, the likelihood that they caused his death, and the location of the attack. Yet, other evidence not only illustrated the same points but also appellant's sole involvement and guilt. For instance, appellant admitted, in his confession, to kicking and hitting Draper outside Lewis' house. Furthermore, Lewis described the blows, the anger with which they were inflicted upon Draper, their repetition, their force and severity, and their incapacitating effect. Indeed, that she could hear them while she hid inside her house was rather indicative of the great force with which they were imparted upon appellant. And, while evidence indicated that someone other than appellant may have dragged the body elsewhere, there was no evidence of record indicating that anyone else struck Draper or that Draper hit anything while being dragged which would have inflicted injury of the magnitude he suffered.[4] In sum, the expert's testimony about the supposed spatters may not have gone unnoticed by the jurors, but we cannot say, after viewing the record as a whole, that it substantially swayed them to convict. So the error, if any, in admitting the blood spatter testimony did not affect a substantial right of appellant.

### Point of Error Seven

In his seventh and final point of error, appellant complains that the trial court erred in refusing his proposed jury instruction explaining the connection between the murder and the commission of robbery. That is, he thought the court's instructions about the elements of capital murder were insufficient. This was so because the State allegedly tried to blur the requirement that the murder occur during the course of a robbery or attempted robbery and because a police officer testified that the taking was an afterthought. Thus, the court needed to clarify the law and minimize the State's contention by providing the additional charge that:

> proof of a robbery committed as an afterthought and unrelated to the murder will not support, and is not in the course of committing or attempting to commit the offense of murder, [sic] you must find that the murder, if you so find, was committed in order to facilitate the taking of property before you can convict of capital murder as defined herein.

We disagree and overrule the point.

In *Moody v. State, supra,* the Court of Criminal Appeals held that an instruction similar to that requested by appellant, albeit one more elaborate, need not be given. This was because the instruction submitted by the court not only covered the elements of the offense but also required the jury to specifically find that appellant murdered his victim while in the course of committing or attempting to commit the alleged robbery. That was enough to inform the jury that the robbery had to be more than an afterthought, according to the court. *Moody v. State,* 827 S.W.2d at 892–93. Here, the instructions were no different. They informed the jury of the elements of capital murder and also required it to find:

> beyond a reasonable doubt not only that on the occasion in question the defendant was engaged in the commission or attempted

---

4. Not even the evidence about the polygraph or its results evinced that someone else did "execute the *coup d'etat,*" [sic] as argued by appellant. It merely suggested that Clemons was untruthful when questioned about someone moving Draper to the alley and taking various personal items from him. Nothing was said about whether other persons struck the decedent after appellant left.

commission of the felony offense of robbery of Robert Draper, as defined in this charge, but also that *during the commission of the robbery or attempted commission thereof,* if any, the defendant struck the said ... Draper with the defendant's hands and feet *with the intention of thereby killing him.*

(emphasis added). Just like those in *Moody,* the instructions at bar "required a finding that the murder took place during the commission or attempted commission of the robbery." *Id.* at 893. They also "provided the same guidance as did those requested by appellant." *Id.* Thus, they distinctly set forth the law applicable to the case. *Id.* No others were needed.

It may be that a police officer opined that the robbery was an afterthought and that the State attempted to down-play this and the element in question. Yet, to demand that the court highlight the officer's testimony and the purported deficiency in the evidence via an additional instruction is nothing short of requesting the court to comment upon the weight of the evidence. *See GTE Mobilnet of South Texas v. Telecell Cellular, Inc.,* 955 S.W.2d 286, 292 (Tex.App.—Houston [1st Dist.] 1997, writ denied) (stating that an instruction which encourages the jury to give undue weight to certain evidence is an impermissible comment on the weight of the evidence). Contrary to appellant's representation, he was not merely asking for an instruction on a defensive issue raised by the evidence. Thus, we find nothing wrong in the court's decision to reject appellant's request.

Accordingly, we affirm the judgment.